The second case for today, Doe v. Luzerne County. Good morning, Your Honors. May it please the Court, my name is Cynthia Pollack and I represent Jane Doe. I would like to reserve two minutes for rebuttal. Now there's another counsel on your side. Yes, Your Honor. I am pleased to introduce John Verde, who is also amicus and he's with the Electronic Privacy Information Center. I know a little bit about that. But is the two minute rebuttal coming out of your time? My time. Okay. He gets his full ten minutes. Okay. Thanks. Thank you, Your Honor. I'm sorry. Five minutes. Sorry. Couldn't put that past us. Your Honors, in this case, we are asking that there is a privacy right in one's unclothed, naked body, which is only covered with a transparent sheet, that there is a right to privacy there. Excuse me. Will you stop right there? Because that, to me, is an important point. First of all, I assume that you agree that to the extent this right exists, it's derived from the Fourteenth Amendment under our jurisprudence in this circuit. I believe the right is under the – you have a Fourth Amendment and also the Fourteenth Amendment. So there's two amendments that deal with this issue, because it was a search and seizure, so that would be the Fourth Amendment. I'm not asking about the search and seizure right now. I'm asking about the right to privacy. Okay. Because my understanding of our jurisprudence is that that derives from the Fourteenth Amendment in this circuit. But be that as it may, I understood you to say that this right to privacy was as to someone's nude body. Are you really seeking to define the right that narrowly? Because my impression from reading the district court's opinion was that he may have looked at it that way, but there's certainly a question, factually it seems to me, as to whether or not what was exposed was in fact what would meet the definition of nudity. So is there not a right to privacy, according to your position here, to something beyond a nude body? Yes. You have a – I would agree with you that your right to privacy – like, it's my body. If I choose not to disclose it to the public, it should remain private. So I have bodily integrity. The government can't come in and look at my body, can't see my tan lines, can't see different things, my boobies or anything like that, which was some of the facts that were in this case. But I think that it is broader than just nude. I should have been more precise, and I apologize. My impression was that the district court seemed to be centered on nudity with respect to genitalia. Correct. Yes. Yes, sure. And had not extended it beyond that. And I wanted to be clear that I understood your position, that it did go beyond that. Yes. It goes beyond that. He wanted to point to certain areas, which there is no case law that says, you know, your boobs are protected, your stomach's not. There is no case law that defines the right to privacy that way. Is it – I'm sorry. I'm sorry. Go ahead, Tony. No, just on the – on this particular point, there's a video, or more than one video. So at this point, shouldn't we know what was exposed and what wasn't exposed? Well, there is some issues with the video because of the fact that it is disrupted in its recording. It's not a continuous recording. So what actually was recorded, we'll never know because there is no electronic – we can verify that this is everything that he recorded that day, and there was also a camera from a phone that's now been destroyed. So we'll never know those things. However, there is a video that – of what they have turned over, what they did capture, which was one picture was a male who was in a shower, completely nude, with the water running over him. That was, you know, filmed, and then my client, who was just with a sheer transparent piece of paper around her private areas, that was recorded, and it disclosed her tattoos. And also there was discussion about her tan lines, her butt, different things like that, which – All right. Now, are we – factually, are we limited to those two images, or are you trying to – do you have other images that you say are now lost, but because of oral testimony should be taken into consideration and are matters of dispute that ought to – Well, I think there should be an inference against the defendants because how will we ever know what was completely recorded that day because we don't have any concrete verification that that was the film taken. But from the film we have, clearly it's an invasion of privacy because of the fact that – I don't understand your answer. And I don't – and I don't know that you're answering Judge Sirica's question.  Judge Sirica – I understood Judge Sirica's question, but he can clarify it. It was, are we limited to what is on the video in terms of what was taken, or can it – there's a factual issue, I guess. Can it go further? I mean, are you saying that this is – you're limiting yourself to these films, this film? Well, it was also that my client has had testified to other acts that occurred that do not make themselves available on the film for whatever reason. So her testimony – In the car and so forth. Pardon? Behavior in the car or – Behavior in the car, and then also behavior on that day that when they're in the shower room, which is really where the heart – The decontamination. Yeah. It's a shower room. They call it a decontamination room. She was being showered there to be free from the fleas that she had obtained as a result of going on the job serving a search warrant. Well, yeah, we know that part of the facts, but can I go back to the first question that I was going to ask, which is the definition of privacy? To what extent does privacy encompass the fact that someone, the subject, thinks it's private and is attempting to conceal it? I think you have a right to privacy. If you yourself believe that something's private and you don't hold it out for everyone to see, certainly it's a private issue for you. But you wouldn't go so far – I guess, I don't know. What about if somebody has something on his or her hands and always wears gloves? That's a very interesting – That's why I'm here. Yes, that's very interesting, and I think that if I don't hold it out to the public, then I can protect – then I have a privacy right in it because I'm not exposing it to the public. Shouldn't there be also some concept of the rest of the general public deems that that could be private? It has to be reasonable. I mean, it wouldn't – it may not be – suppose you don't have anything wrong with your hands. You just don't want people to see your hands. Maybe I have a burn or something, a deformity, a deformity that I don't want other people to see. Did you? Go ahead. That's all I was saying. Did you purposely limit yourself to a constitutional right? You didn't include a state law privacy right. There is a state law privacy right. There is a state. However, the entity responsible would be deemed immune under that law, perhaps, because of tort liability. But to me – That's a perhaps question. But as a lawyer, you usually cover every – I mean, I know you usually do cover everything. And I was surprised not to say the restatement contains a right to privacy. And Pennsylvania law accepts the restatement. Can I answer your question, Your Honor? Of course. Go ahead. We're asking questions. You're on our time now. Okay. So to me, this is – this rises to the level of a federal constitutional right because we have a right in our personal bodies, and the government cannot view it, seize it, and then replay it. I know you'd like that. But don't we have an obligation not to consider a federal constitutional right if there's some other option to get to the same place? Absolutely not. No. No. Because to me, you're – you look at whatever – you don't have to look, oh, well, there's another law. She could have sued under that. So you don't have a federal right. I think you look at the federal right. Let's assume for the purpose of argument that we do. Okay. That what Judge Slobiter stated is the way we operate. Then where are you? Okay. If you look for alternative laws and you don't look whether there's a federal law – No.  have to. I don't believe it is implicated here, but I'd have to do further research to make sure that I know that it isn't. But to me, there is – you have a search and seizure, which was what occurred, as well as a violation of your due process, right? So there's two laws that I can sue under. I don't have to go state and not go federal. To me, that is not a requirement, but I may be wrong. Well, can we return to a question that I think came close to this anyway? What is the standard here? As I understood, part of your position in your brief was that you said the district court got it wrong. It applied the wrong standard. I think what the district court did was to employ a shocking degradation or an egregious humiliation to the plaintiff standard. Am I right? Correct. You think that's wrong. What should be the standard? From looking at the case law and one of them, it should be a balancing test in connection with the interest that – the privacy interests versus the government's interest in filming or – We have a precedent in this court, Nunes versus Packin, which says that the Constitution protects against public disclosure of only highly personal matters representing the most intimate aspects of human affairs. Is that the correct standard? I – my thoughts are that that is right and so forth, that that is what – we only have a property – I mean, an interest in our bodies. So my case would fit in that because your body is – you have a right that's a deeply fundamental right is your privacy and your body. So I think that we meet that standard, but where the court went is that the egregiousness, that you have to show egregious humiliation, which to me, this is – this whole process that was recorded was humiliating. So it does rise to that level because the government should not be able to record you when you are nude, only covered with a sheet of paper for no reason. But to humiliate me, that is what – that's what occurred here. They want to say training purposes. This was never made into a training video. This was to humiliate and record the humiliation of those two officers that day. And that's not – That was the purpose of taking the film. Yes. Do we have to accept your view of what the purpose was? Yes. For summary judgment, you have to look at it through my prism. So they were just doing this for their own vindictive purposes or their own purian interest or – Boy, for your – for your – Why can't I say it? Voyeurism. Voyeurism. Yes. Yes. Was it voyeuristic? Because of the fact – So it was personal to Foy and those assisting him? Pardon? It was a personal interest of Foy's and those working with him. It was a personal interest of Chief Foy, absolutely. If that's the case, then I'm trying to figure out how you have a Fourth Amendment claim here, what possible governmental interest is there in any kind of search or seizure shifting to the Fourth Amendment claim from the privacy claim? Okay. There is – When the government sees as my – No, no, no. You have just taken a 180-degree turn from what you said a few seconds ago. The government isn't doing it if they as individuals are doing it for their own personal purposes. No, Your Honor, only because the fact that Chief Foy was a policymaking individual that therefore binds the municipality. And to me, what purpose would you have of videotaping a nipple ring of the gentleman? How does that have any purpose whatsoever in a sense of for training purposes? And that's what I'm arguing, is that it wasn't for training purposes. I'm saying I believe personally that it was Chief – So it was not in furtherance of any governmental investigation? It was – It is – It wasn't for investigation. It was a search and a seizure because of the fact that filming – I seized images and then I displayed them for people back at the office of nude and partly nude parts that had no purpose for training. Okay? Any further questions? You have any questions, Your Honor? Thank you. Thank you. Good morning, Your Honors. John Verdi on behalf of Amicus, the Electronic Privacy Information Center. This case presents novel privacy issues involving new technology. The district court failed to appreciate the unique damage that is caused by unlawful disclosures of information over computer networks. Whether they're lawful or not, or unlawful, is the issue, isn't it? It is the issue, Your Honor. So perhaps I would say that the district court failed to appreciate the unique damage caused by disclosure of personal information at all over office computer networks. You identified in your brief as the issue that we have involving the right of public employees to remain free from surreptitious video surveillance while undressed as they shower at the workplace. How is that the issue in this case? Well, Your Honor, I believe that the factual recitation there is accurate, that this is a public employee who was videotaped surreptitiously based on the factual record in this case, that she was unaware of the videotaping as it occurred in the shower and only became aware of it later. She was aware of other videotaping within this context, but she was unaware of the videotaping in the shower. So the videotaping was surreptitious.  Your Honor? Do we know what the disclosure was? Your Honor, I believe there are three distinct privacy harms here. First is the videotaping, the collection. The second is the display. We know that Deputy Foy played this video for fellow employees in his office on his computer monitor. And the third is the distribution over the computer network. And in fact, in the record at Appendix A-814, there is factual evidence supporting the proposition that the video was either viewed, transferred, or copied 66 times after it was placed in the shared folder on the computer network. So that strikes me as a substantial distribution. Mr. Verdi, what was surreptitious about this filming? Doe herself testified that she was aware of it constantly. Your Honor, I believe the District Court found that Ms. Doe testified that she was aware of the filming when she was in the car, when she was in the parking lot, when she was walking into the decontamination facility, but that she was unaware of the extent of the filming when she was in the shower because her back was facing the shower door. She had decontamination materials in her hair, which obscured her vision, and that she at no time turned around to look and see whether or not the door was opened. And how did this occur at the workplace? She was on her employer's time during this. She encountered the flea infestation when she was working. She was in her squad car, which is her police officer's workplace, when she was filmed. And she was instructed by her employer to enter the decontamination facility, which is, I believe, an extension of her workplace. She was under the direct orders of a supervisor to go to this decontamination facility, engage in the decontamination procedure while she was in the course of her employment, in the role of her employment, in her role as agent of Luzerne County. Your Honors, I think it's clear that the Supreme Court recognizes the unique rights at issue here concerning digital distribution. In Whalen, Justice Brennan warned that collecting digital information vastly increases the potential for abuse. And there, the Court noted that the Constitution limits the means of information collection as well as the content of information collection. And I think that that is at the heart of this case. It is the digital collection, the display, the digital copying, and the ease with which it was transmitted and disclosed over the computer network to untold fellow employees in Luzerne County that's critical to the privacy analysis. So you would have, let me just understand, you would have us define the privacy interest in all three of the aspects that you mentioned, videotaping, display, and distribution. And if you don't have one of those, then is it no longer covered by the privacy interest? For example, suppose you had no distribution. Your Honor, I believe that each is an independent constitutional violation. And that even if the collection is constitutional, the display was not. And even if the collection and display were constitutional, the distribution was not. How could the collection have been constitutional? Because it was for training, supposedly training purposes? Well, that's what the county argues in this case. Yeah, but I'm asking what your, I mean, I'd like to know your position. My view is that the collection was unconstitutional, the display was unconstitutional, and the disclosure was unconstitutional. And all three are independent violations of the privacy right as you define it? Yes, Your Honor. And that follows from the Supreme Court and the Third Circuit precedent on this issue, which distinguishes between circumstances where there is lawful collection, but that disclosure may be unconstitutional. I think Judge Sirica has a question. Yeah. Assuming this goes to a jury, the jury then, the jury would be finding whether there was a violation of privacy. And I think you've listed the three main areas where privacy might be violated. What would be the jury instruction on the level of privacy that would attach to a semi-nude body? I mean, what if, you know, what if Doe had a bathing suit on during this whole time? Would we be here or we would not be here? I mean, what kind of, I'm just trying to think how a jury would be instructed on the privacy part. Often in these circumstances, although the informational privacy right derives from the 14th Amendment, often a Fourth Amendment reasonable expectation test is imported. There's also a balancing test concerning the government's interest versus the relative level of the individual's privacy. But I think the reasonableness calculus is the key to a proper jury instruction in that context. Thank you. Thank you. Thank you. We'll hear from the appellee, who I guess represents both the county and the individuals. Yes, Your Honor. Okay. Mark Buffling on behalf of Luzerne County and Mr. Foy and Mr. Stankus. With the Court's permission, I'd like to start with one of Judge Smith's questions, whether Nunez presents the proper standard in this case, and we clearly think that it does. As this Court had said in Nunez, it must be an egregious degradation or humiliation of the person who had their privacy rights allegedly violated. You don't think that just by definition videotaping a woman in the shower covered by something that is not opaque is necessarily degrading? What was the rest of that? Whatever it was. A public disclosure of highly personal matters representing the most intimate aspects of human affairs. Yeah. Isn't that by definition covering taking videotape of a woman in a shower who tries to hide her private parts? That would be, but that isn't this case, Your Honor, with all due respect. How do we know? I mean, that's what the allegation is. I understand. We had a very extensive discovery process which disputed and put that notion very squarely to rest. Well, why wouldn't a jury be able to decide? Shouldn't a jury be able to decide that? There's no genuine issue of material fact, whatever, that a jury could consider. The plaintiff's own testimony was very clear, and I think – I forget which one of Your Honors inquired about it, but the – Consider us as a whole. Yes, ma'am. The plaintiff's own deposition testimony made it very clear that she was in the shower while she was completely nude and taking the shower and using the decontamination process and shampoos and products. The door was completely closed. When she was about to be finished, the door was just slightly cracked where she stuck her head out, and one of her fellow female deputies assisted her in combing out the potential fleas from her hair. That all may be so, Mr. Bufalino, but that is all factual, and it's all part of what is in the record, and it may be subject to dispute here and there. But with respect to our effort to get to a standard or standards applicable here, and as Judge Sirica has asked, instructions that necessarily would have to be given to a jury if this case were to go back, I'm concerned in my reading of the district court's opinion that notwithstanding what you've indicated about what the record shows, that the district court may have had a rather narrow view as to what would constitute an invasion of privacy, or more to the point, the exposure of what portions of the body might constitute an invasion of privacy. Do you not think the opinion reads as if he might have been limiting the exposure and outrage from that exposure to exposure of genitalia, and as a consequence, what he saw in this record just didn't meet an invasion of privacy standard? I do not think that he was limiting himself to specific body parts. I think when he cites Nunez, and it has to meet the level of an egregious degradation or humiliation of the plaintiff, one looks at each case, as this court does, when it looks at all privacy-alleged violations, to see, to balance, and to analyze the potential privacy interest against the states, whether or not there's a compelling state interest. In this particular case, the court, in addition to citing Nunez, if memory serves, also referenced, well, actually, it was the plaintiff in her own papers below and before this court, cites the Michael C. versus Dressbauch case in the Seventh Circuit, and to go back to something that I think Judge Sloviter had asked before, is it just what the person intends to keep private? Yes and no. It is, that is one part of the test. In that case, the Seventh Circuit, and I think this court, in Nunez, was saying the same thing, although not in the same words, said that a reasonable expectation of privacy exists when one exhibits an actual or subjective expectation of privacy, and that expectation is one society is prepared to recognize as reasonable. Are you quoting from Nunez? No, ma'am. That is the Michael C. versus Dressbauch case. That's one of the Seventh Circuit decisions that is cited in the appellants' papers. The district court didn't rely on that case, did it? I don't think so. I think I corrected myself. I think I pulled that from the appellants. But I think it's when you look at the fact that this court has never, this circuit hasn't had the opportunity to evaluate a case on this factual basis. When you look at Nunez and you look at that standard, I think that comes full circuit to Judge Sirica's question about what the jury instruction would be. Mr. Petalina, the district court also relied, at least to some extent, upon the prison line of cases, at least in Sidney Davis versus Buchert from the Ninth Circuit. Those cases really aren't applicable here, are they? We're talking about a completely different level or standard of privacy when we're talking, expectation of privacy when we're talking about the prison context, aren't we? Yes, in terms of the prison context. I think no in terms of whether or not the person's, whether you have the surreptitious recording and dissemination of a person's nude or semi-nude body, I think that was the purpose for which the district court was referencing them. And that becomes relevant here because even as we sit here today, despite the evidentiary record below, we're still hearing references and arguments to this court that the papers that, the sheet that was put around Ms. Doe was see-through. That's a complete... Well, so what do you take, where does that lead you? Well, it leads me to the fact that the only thing that was exposed on this woman in the context of this decontamination shower was nothing more than what would be exposed had she been in, as Judge Sriska said, a bathing suit. It was her neck and her back. Yeah, but you just said it was see-through. No, no, no. It was not see-through? It was not. In fact, Mr. Lamoureux... Is that a factual issue? It's not an issue anymore. I mean, it was testified to by numerous people in the record, yes, and the court found very clearly that there was no genuine issue of material fact as to that issue. In fact, he cites her own deposition testimony. Was that as a matter of oral testimony or as a matter of what's on the video? I'm glad you asked that because it's both, Your Honor. One need only look at the video, as I'm sure the lower court did, to know a couple of things. Number one, at no point during any of this process were any parts of Mrs. Doe's body that would be reasonably expected to be secreted from the general public or even from members of her own fellow employees ever, ever exposed. Number two is, and it goes back to a question Judge Smith had asked, there is absolutely nothing or was nothing surreptitious about this video at all. A simple viewing of this video makes it clear that Mrs. Doe is interactive with not only Mr. Foy but Deputy Joyce and the other members who were present that day. And Deputy Shumsky and all the other members of the Sheriff's Department who were present. In fact, much is made about some rather probably inappropriate questions that are put to Mrs. Doe to which she responds. The reason that they know that the people on the video make it clear, the video makes it clear that the reason that the others in the room know what the things that are on her body is because she responds to them. Let me ask just a couple basic factual questions here, and I hope Ms. Pollack will respond when she is up on rebuttal. What does the record show was exposed on Doe's body when she was in the decontamination room? Nothing. The door was closed. When the door had come open? When the door came open. And portions of her lower leg. And you are telling us that as a matter of fact, she was covered by an opaque cover. You could not see through the sheet that was covering her. That's what opaque means. Yes, ma'am. In fact, the security officer who was present that day and who testified of record had testified that particularly on that point. Which of Doe's body parts were exposed in the video shots? Her neck and her back. And her face, obviously. There were also some exposed still spots, I think, shots, weren't there? They show up on the computer? There was much made in plaintiff's complaint about images of Deputy Shumsky. Well, number one, Deputy Shumsky is not a plaintiff in this case, so it's totally irrelevant from our perspective. Had he been so aggrieved by what was allegedly on the county's computers, he certainly could have filed an action. He did not. Secondly, as far as the dissemination goes, that's another unicorn. It didn't happen. Even over our own objection, we were required by the district court to employ the services of a computer expert to go through the county servers to determine not only what was on the servers but what had been deleted. In addition to that, who might have had access to that. We, because of it was the plaintiff's burden, if she thought if that's an element of the plaintiff's case, that's her burden to carry. That was so over our objection. But we hired an expert. There was absolutely no evidence of any dissemination of any kind. So I'm not really sure from a factual standpoint where that's coming from, but there was actually the services of expert testimony in the record, I think, which the court. So you're saying no evidence of dissemination, but there was display? There was. All right. There was. I think there was an isolated instance of a display when they returned to the county sheriff's office, but the images that we're talking about here is what we've already gone round and round about already, which is that it was nothing that would have caused a humiliation or degradation of Mrs. Fudd. Are you referring to when they were gathered around a desktop computer? The video is the video, yeah. I mean, whether it was in the sheriff's office or out in the parking lot. And by the way, I think, Judge Smith, you asked about while they were in the car. The record makes it very clear that while they're outside of the Luzerne County Emergency Management Office, they are videotaped in the car, sitting in the car, fully clothed. The video is shut off. They drive from there because they can't get the decontamination shower together to Mercy Hospital, where the camera is turned back on. After they leave Mercy, they drive back to the county. The camera is turned off. So there's no getting around. I think the district court got it absolutely right. I think it was poorly conceived, but it does not rise to the level of a constitutional violation for the plaintiff. Any questions? Any questions? Thank you. Thank you. Ms. Pollack, I wish you would help me, because I may have been looking at this case incorrectly. It was my understanding that she was covered by a see-through something in the shower. Is that incorrect? Your statement right now is correct. It was see-through, and how we know that. How do we know that? Does the district court say that? No. A648. I'm going to give you cites, because to me, often people will say things but won't give you the cites to look for in the appendix. Okay. Give us the cites. A648. You hear counsel had replayed the video for my client, and she is reciting what is seen and what is heard, and she actually states about that someone, an onlooker, is saying you could see her boobies. Obviously, you can see through it, and she is wet. I thought her back was true. At one point, you can hear an onlooker say you can see her boobies. All right. So what you are suggesting then is that what you have is a piece of circumstantial evidence, that is, that we can infer from the statement that this must have been see-through paper. Correct. And it was a paper covering, wasn't it? Yes. Like hospital paper? Like when you sit on the doctor's chair when you get examined, that piece of paper is what is wrapped around her. I read the entire deposition transcript of your client amidst the many objections. Is that all you have? No. Yes. Give us more. Okay. Give us appendix pages. A664, which is A664. A664. Which you hear them talking about her tan lines. You have to see my tan lines to be able to talk about my tan lines right. A664 again talks about her butt. They call it ass. And then A664 again talks about, and this is their words, not my words, but I'm being clear for the court, shit on her back, which is apparently her tattoo, we're assuming. A665, what is that crap? A big rip in your ass. That is heard on the video. I have testimony that a fellow deputy was embarrassed for her for what he saw on the video. A655. I have testimony someone said grab back to cover her up. A666. I have all that evidence which should have been viewed in my favor and should have allowed me to get to a jury to be able for the jury to make the factual determination was this being shown on the video, was it recorded? I find it surprising that there's nothing about that in the district court's opinion. One would have thought that the fact that it was see-through would have at least been referred to. And it isn't. I can't explain what he wrote. However, I can point you to where I have it in the record, which was provided to the district court. But that's drawing, as Judge Smith said, inferences from circumstantial evidence. There's no evidence that anybody says I saw this. This is the kind of paper she had around her. Definitive. Certainly the chief boy who took the video isn't going to say I saw her boobs, I saw her butt. Why not? He's a defendant. He's an interested party. But you questioned him. He had a deposition. Did you ask anybody how much they saw? I may have, Your Honor. But you haven't shown it to us. To me, the fact that she testifies in her deposition about what people are saying around is the best evidence because it's actually right there. And it really isn't circumstantial. It's evidence. It's straightforward evidence that an onlooker is saying X, Y, and Z. Well, straightforward evidence would be a video picture that shows it. That's what I would consider straightforward evidence. Judge Sloviter. No, no, just to follow up with Judge Sloviter. Am I correct that the video does not show whether, either does not show the paper or does not show whether it was opaque or see-through? You do see her in the paper. So you can see her in the paper. So to me, you can see that it's opaque, you know, and especially with being wet. I mean, not opaque. See-through. I'm sorry, see-through. That's the only way that I could say it. But going back to your consent, she never consented to this. And I can't control a video of an employer. If my boss wants to record me. I never said consent. I said she was aware of it. She knew. But how does that make it okay because of the fact a boss? I didn't say that. Okay. I'm just saying that she never asked to be recorded, nor did she ever think that she was going to be videotaped in a shower room. Most people would not have done that just out of pure professionalism, but that's not what happened in this case. I just want to leave the court with a quote that I think is really good, and this court has cited it in U.S. Skoblewski, 402 F3D 175, and it's just about the experience should teach us to be most on guard to protect liberty when the government's purpose are beneficial. Persons born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The great dangers to liberty lurk in the insidious encroachment by men of zeal, well-meaning but without understanding, and certainly I believe that my client had a right to privacy under both the Fourth and the Fourteenth Amendment. Thank you. Do you think that this case turns on whether it was see-through or not? No. So assuming for the moment that it was not see-through, and you won't like that, but just let's assume for the moment that it was not see-through, is there still a violation of the right to privacy? Absolutely. When I'm in a medical facility in a shower room, you have no right, government, to come in and see my tan lines, any of my tattoos that I keep covered from your view. And her sexual orientation was tied into her tattoos. That's a private fact, and you don't get to come in and find out those things about me unless I give you permission. So to me, in addition to the recording, regardless, I should say, of whether you can see or not, you're seeing things that you're not entitled to see in a medical facility which is private and should not be recorded, and then disseminated for the whole office to see, and for me to be humiliated again when I can't control what you're doing. Okay. Thank you. We understand your position. Thank you. We'll take the case under advisement.